## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TAMMY WILLIAMS, | ) | 4:09CV3116 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, as | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the plaintiff's application for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 1381 *et seq*. and disability health insurance benefits under Title XVIII Security Act, 42 U.S.C. § 1395.[1]  The Court has carefully considered the record (AR.) (Filing No. 14 - not available electronically) and the parties' briefs (Filing Nos. 21, 24 and 25).

### PROCEDURAL BACKGROUND

The plaintiff, Tammy D. Williams (Williams), filed her application for disability insurance benefits on March 10, 2004 (AR. 98-100).  The Social Security Administration (SSA) denied benefits initially (AR. 70) and on reconsideration (AR. 77).  Williams requested a review and a hearing before an administrative law judge (ALJ) (AR. 82).  On July 12, 2005, Williams and vocational expert (VE) Gail Leonhardt, appeared and testified at a hearing before ALJ, James Francis Gillet (AR. 556-600).  Williams' attorney also appeared at the hearing.  On August 24, 2006, the ALJ issued his written opinion[2] that Williams has not been under a disability since the alleged onset date of disability, October 13, 2003 (AR. 62).  The Appeals Council granted Williams' request for review and on

---

[1]The parties consented to jurisdiction by a United States Magistrate Judge pursuant to to 28 U.S.C. § 636(c).  **See** Filing No. 16.

[2]The ALJ's August 24, 2006, decision does not appear in the record but is mentioned by the Appeals Council in its August 20, 2007, order.  (AR. 62).

August 20, 2007, the Appeals Council vacated the hearing decision and remanded the case to the ALJ for further proceedings (AR. 62-64).

On March 5, 2008, Williams, vocational expert (VE) Gail Leonhardt, and medical expert (ME) Robert Karsh, M.D.,[3] appeared and testified at a second hearing before ALJ, James Francis Gillet (AR. 601-654).  Williams' attorney also appeared at the hearing.  On October 20, 2008, the ALJ issued his second written opinion that Williams has not been under a disability since the alleged onset date of disability, October 13, 2003 (AR. 22-48).  On April 3, 2009, the Appeals Council denied Williams' request for review (AR. 8).  Therefore, the ALJ's October 20, 2008, decision constitutes the Commissioner's final decision subject to judicial review.

Williams claims the ALJ's assessment of her residual functional capacity (RFC) was not supported by substantial evidence because the ALJ:  (1) improperly discounted the opinion of Nurse Practitioner Catherine Phillips; and (2) improperly relied on outdated evidence.  **See** Filing No. 21 - Brief p. 2.


## FACTUAL BACKGROUND

Williams alleges she has been disabled since October 13, 2003, as a result of depression, anxiety, rapid cycling bipolar disorder, and several physical conditions including fibromyalgia and head tremors (AR. 98, 113, 127, 177).  Williams was born February 26, 1964, and was 39 years old on her alleged onset date and 44 years old on the date of her second hearing before the ALJ (AR. 605).  She completed high school and two years of college including a nine-month dental assistant program (AR. 118, 523).  Williams has worked in numerous positions including:  dental assistant, cook, secretary, customer service representative, office manager, and potato sorter (AR. 119-126,173).

Williams' disability application and the ALJ's October 20, 2008, decision address both physical and mental impairments (AR. 22-48, 98-100).  In this administrative appeal, Williams challenges only the ALJ's determination of disability with respect to her mental

---

[3]Dr. Karsh testified as to physical disabilities alleged by Williams.

impairments.  Therefore, the court will limit its discussion of the factual background and analysis to Williams' mental impairments and resulting limitations.

### A.    Medical Records

On June 27, 2003, a few months before her alleged onset date of disability, Williams saw Paul C. Wibbels, M.D. (Dr. Wibbels), complaining of "recurrent problems with insomnia, fatigue, anxiety, sleeping, generalized problem with lightheadedness" (AR. 287). Dr. Wibbels prescribed Zoloft (AR. 287).  On November 13, 2003, Dr. Wibbels decreased Williams' dosage of Zoloft due to reported side effects of fatigue, confusion, and falling asleep at work (AR. 284).  Dr. Wibbels saw Williams for a follow-up examination for her anxiety on December 12, 2003, and prescribed Prozac (AR. 283).

Williams sought out counseling on March 5, 2004, at South Central Behavioral Services, Inc.  (SCBS) (AR. 351).  Williams reported feeling depressed but indicated that she had experienced episodes of mania as well (AR. 351).  According to the entries on the Emergency/Preadmission Screening form, Williams presented well-groomed, and her facial expression, dress, and interview behavior were appropriate (AR. 352).  She was further assessed as having intact memory, good insight and judgment, and above normal intellect (AR. 353).   Williams was encouraged to see her physician and to return to SCBS for an intake to initiate counseling (AR. 353).

Williams returned to SCBS on March 12, 2004, and completed an intake assessment with Doyle Daiss, LMHP (Mr. Daiss) (AR. 347-350).  Williams described having had "17 jobs in the last 20 years . . . [and having] quit almost every job because she became bored" (AR. 348).  Mr. Daiss noted Williams displayed a slightly flat affect and cried often during the intake process (AR. 349).  Mr. Daiss opined, "[a] mood disorder of some magnitude is suspected, and consideration is also given to the possible presence of a personality disorder" (AR. 349).  Mr. Daiss recommended Williams participate in weekly or bi-monthly individual therapy (AR. 349).  Williams began therapy with Mr. Daiss on March 22, 2004 (AR. 344).  With the exception of two periods of time when Williams temporarily moved out of the area, she continued to meet with Mr. Daiss until the March 5, 2008, hearing (AR. 614).

On March 16, 2004, Williams saw Michelle Seizys, M.D. (Dr. Seizys), at the request of Williams' therapist (AR. 282). Williams reported that her counselor thinks she might be bipolar (AR. 282). Williams complained of problems with maintaining focus and going on shopping sprees that she cannot afford (AR. 282). Dr. Seizys noted that as this was not her area of specialty, she arranged an appointment for Williams with Catherine Phillips, A.P.R.N.[4] (Ms. Phillips) at the Mary Lanning Center for Behavioral Services (Lanning Center) (AR. 282).

On March 25, 2004, Ms. Phillips met with Williams for a diagnostic psychiatric evaluation and medication management (AR. 322-324). Ms. Phillips noted Williams appeared in clean, appropriate clothing, well-groomed, with manicured fingernails and toenails (AR. 323). Ms. Phillips described Williams as "extremely labile" during the interview, tearful and easily distracted (AR. 323). Ms. Phillips gave Williams an initial diagnosis of bipolar 2 disorder, with the rule out diagnoses of cyclothymic disorder and personality disorder, and a GAF of 50[5] (AR. 323). She prescribed Lamictal in addition to the Prozac as previously prescribed by Dr. Wibbels, and directed Williams to call the office in two weeks and return for a symptom evaluation/medication check in one month (AR. 323).

Williams called the Lanning Center on April 19, 2004, to report she was doing fine on the Lamictal (AR. 321). She followed up with an appointment with Ms. Phillips on April 27, 2004 (AR. 320). Williams reported significant improvements with the Lamictal, including better sleep, focus, and mood stability, and less anxiety and confusion (AR. 320). Ms. Phillips increased the Lamictal dosage slightly to address "residual mood lability" (AR. 320).

---

[4]Advanced Practice Registered Nurse.

[5]The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. text rev. 2000) (DSM-IV-TR). A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). **See** DSM-IV-TR at 34.

On May 7, 2004, Williams met with A. James Fix, Ph. D. (Dr. Fix), for a consultative exam (AR. 301-05).  Dr. Fix noted Williams appeared for the psychological interview appropriately attired with "numerous pieces of jewelry and painted fingernails" (AR. 301). He described her emotions as brittle, noting that she was "highly talkative, loud, joking, but her presentation [was] punctuated also with outbursts of tearfulness" (AR. 301).  Dr. Fix concluded Williams had been accurately diagnosed with bipolar disorder and was benefitting from the prescribed medications (AR. 305).  Dr. Fix found no difficulties in social functioning, and further noted that Williams was "capable of sustaining concentration and attention" and able to adapt to changes in her environment (AR. 305).

In June 2004, Patricia Newman, Ph. D. (Dr. Newman), a state agency psychologist reviewed Williams' records from Dr. Seizys and Dr. Fix, as well as reports of daily living functions from Williams and her roommate (A.R. 218-237).  Dr. Newman opined that Williams' claim is "partially credible as there are medically determinable impairments of mental conditions that are consistent with moderate restrictions" (AR. 237).  However, those "[c]onditions are not consistent with more than moderate restrictions" and Williams' "mental conditions do not preclude simple unskilled work (AR. 237).

Williams missed her June 16, 2004, medication check with Ms. Phillips and next saw Ms. Phillips on August 4, 2004 (AR. 319).  Ms. Phillips noted Williams was neatly groomed and appropriately dressed, although her hairstyle was somewhat childish (AR. 318). Williams' affect was "initially superficially bright" (AR. 318).  Williams told Ms. Phillips she had moved to Kansas where she lived with her mother and began training to manage "some type of title loan outlet" (AR. 318).  Williams reported doing "relatively well," however, conflicts with her mother's husband caused her to give up her new employment and move back to Nebraska (AR. 318).  Ms. Phillips opined that Williams was feeling overwhelmed by the failed attempt to return to work in Kansas as well as having medical concerns (AR. 318).  No medication changes were made and she was scheduled to resume therapy with Mr. Daiss (AR. 318).  On August 25, 2004, Ms. Phillips increased Williams' prescribed dosage of Lamictal after Williams called the Lanning Center complaining of symptoms of stress and depression (AR. 306).

5

On September 7, 2004, Ms. Phillips completed the following forms for Williams' disability claim: a Mental Impairment Evaluation, Mental Capacities Evaluation, and Mental Health Statement of Ability To Do Work-Related Activities (AR. 307-317). Ms. Phillips indicated she had seen Williams twice since completing an initial evaluation (AR. 307). Ms. Phillips characterized Williams' bipolar disorder as moderate to severe, ongoing, and possibly disabling (AR. 307). She opined that Williams' former work or similar work could "precipitate mood instability/anxiety that is overwhelming" and Williams' condition might be aggravated by "prolonged stress, irregular work schedule, [and] night shift work" (AR. 307). Ms. Phillips further noted Prozac was effective in treating Williams' depression and anxiety, Williams' dosage of the mood stabilizer, Lamictal, had been recently increased, and Williams had not reported any side effects from the medications (AR. 308). Ms. Phillips further indicated that Williams' condition frequently interfered with attention and concentration (AR. 308).

On the same day, Williams' therapist, Mr. Daiss, completed the same forms as Ms. Phillips with a similar overall assessment (AR. 325-335). In response to questions included in the Mental Capacities Evaluation seeking assessment of Williams' limitations, Mr. Daiss commented, "In depressed phase, Tammy would have difficulty working at all. Overall, I would think she would struggle to work at all" (AR. 330). He further indicated, "Tammy struggles to maintain employment due to several factors, including her depression, and continued disappointment in herself for [continuing] to have problems" (AR. 331).

Williams saw Ms. Phillips on September 14, 2004 (AR. 364). Ms. Phillips noted that Williams was dressed appropriately and her grooming was neat and clean (AR. 364). Ms. Phillips opined that Williams appeared "rather ambivalent with regards to whether or not she is depressed" and Williams commented that her therapist was concerned about her depression and daytime sleeping (AR. 364). Williams also reported problems with short-term memory and feelings of confusion, which Ms. Phillips opined coincided with the recent Lamictal increase (AR. 364). Ms. Phillips decreased Williams' dosage of Lamictal, increased her dosage of Prozac, and directed her to call the clinic with an update in two weeks and return for an appointment in six weeks (AR. 364).

On October 27, 2004, Ms. Phillips noted Williams arrived for her appointment dressed appropriately, with her hair colored and styled, and her nails manicured (AR. 361). Williams complained of a lack of energy, problems with focus and concentration, and feelings of hopelessness and depression (AR. 361). Ms. Phillips noted that Williams chose to reduce her Prozac dosage because of headaches and dizziness experienced after the prescribed increase (AR. 361). Ms. Phillips continued Williams on Lamictal, discontinued the Prozac, and, in its place, prescribed Lexapro (AR. 361).

Progress notes from the Lanning Center indicate Williams called on November 11, 2004, to report the Lexapro "seemed to be working really well" (AR. 360). A note from December 8, 2004, documents Williams' telephone call informing the Lanning Center that she had housing issues, was staying in Missouri for "an indefinite amount of time," and asked for Phillips' recommendation for a physician or therapist in Missouri (AR. 360).

On December 22, 2004, Williams met with Fran Stous, AP/MHCNS (Ms. Stous), for an psychiatric evaluation at ReDiscover, Mental Health &Substance Abuse Services in Lee's Summit, Missouri (AR. 418-420). Williams participated in the evaluation for the purpose of obtaining assistance with medication (AR. 418). Ms. Stous described Williams as immaculately groomed, cooperative and friendly, alert and fully oriented, with a somewhat depressed mood (AR. 419). Williams reported a history of depressive episodes sometimes of more that two months duration with times when she does not care about anything, does not eat, bathe or get out of bed (AR. 418). Ms. Stous opined Williams is able to care for her daily personal needs, has good judgment and impulse control, and fairly good insight, but has difficulty expressing her feelings appropriately and making decisions (AR. 420). Ms. Stous assigned Williams a GAF score of 55 (AR. 420).

Williams began therapy with Angela Lippa, LCSW (Ms. Lippa), on December 29, 2004 (AR. 425). Ms. Lippa described Williams as somewhat tearful during the therapy session and assigned a GAF of 58[6] (AR. 425). When Williams returned to see Ms. Lippa on January 12, 2005, she was somewhat tearful, but pleasant and friendly (AR. 427).

---

[6]A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). **See** DSM-IV-TR at 32.

7

Williams reported looking for a part-time job and described an improvement in her mood and in her adjustment to the move to Missouri (AR. 427). Ms. Lippa assigned a GAF of 60 (AR. 427). In her progress notes from December 29, 2004, to her last appointment on March 15, 2005, Ms. Lippa consistently assigned Williams GAFs ranging from 58 to 60 (AR. 425, 427, 433, 435, 436, 439).

At her medication review appointment on February 8, 2005, Williams complained to Ms. Stous of a head tremor and difficulty sleeping (AR. 430-431). Ms. Stous again described Williams as "immaculately groomed," cooperative, and "tearful but generally with a full range of affect" (AR. 431). Ms. Stous assessed Williams GAF as 58, increased her Lamictal dosage, and prescribed Eskalith (AR. 430).

On June 13, 2005, nearly three months after her last therapy session with Williams, Ms. Lippa completed the following forms for Williams' disability claim: a Mental Impairment Evaluation, Mental Capacities Evaluation, and Mental Health Statement of Ability To Do Work-Related Activities (AR. 366-376). Ms. Lippa's comments regarding her assessment of Williams' limitations and the findings that support the assessment simply reflect symptoms reported to her by Williams (AR. 367-369).

On August 16, 2005, Williams returned to Ms. Phillips for medication management after moving back to Nebraska (AR. 475). Williams complained of "a significant amount of mood lability as well as depression" (AR. 475). She admitted she independently stopped taking her medication two months prior to the appointment to assess the effect on a recently discovered tremor; however, the tremor began before the introduction of Eskalith and has continued for the two months after discontinuing her medications (AR. 475-476). Williams reported that while on the medications she experienced an improvement in her mood lability and felt more like herself, more assertive and self-assured (AR. 475). Ms. Phillips noted Williams arrived appropriately dressed and impeccably groomed (AR. 475).

Ms. Phillips assigned a GAF of 40[7] and reinitiated Lamictal with increasing dosage over several weeks (AR. 476).

At her September 14, 2005, appointment with Ms. Phillips, Williams reported improvement and appeared more hopeful, yet slightly hypomanic (AR. 474). Ms. Phillips noted Williams' clean and appropriate attire, noting her grooming was impeccable with manicured nails and styled hair (AR. 474). Phillips also noted Williams was "reestablishing herself in the community" and her mood and medication were beginning to stabilize (AR. 474). Phillips increased Williams' Lamictal dosage and set a follow-up appointment for one month (AR. 474).

On October 18, 2005, Williams saw Ms. Phillips for a medication review (AR. 473). Williams reported the Lamictal helped stabilize her mood, but she also reported recent stressors including the end of her relationship with her boyfriend and significant financial problems (AR. 473). Williams' grooming was neat and clean, and she appeared "somewhat labile and tearful" (AR. 473). Ms. Phillips increased Williams' Lamictal dosage with a followup visit in six weeks (AR. 473).

On December 14, 2005, Ms. Phillips noted that Williams reported she was doing well, stating she felt "like a person again" (AR. 472). Williams reported being involved with church and volunteer activities at the Salvation Army (AR. 472). She appeared in appropriate attire and neatly groomed. She had lost some weight but remained obese (AR. 472). Ms. Phillips continued her Lamictal at the same dosage (AR. 472). Two weeks later, on December 27, 2005, Williams told Mr. Daiss she wanted to reduce her therapy session from bi-weekly to monthly because her activities with the Salvation Army occupied so much of her time (AR. 190).

On March 14, 2006, Williams saw Ms. Phillips for medication management (AR. 471). Williams reported doing well, but had concerns about her memory and ability to concentrate. (AR. 471). Ms. Phillips noted Williams was doing well with her volunteer

---

[7]A GAF of 31 through 40 is characterized by some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home and is failing at school). **See** DSM-IV-TR at 32.

activities and cleaning twice a month for extra income (AR. 471). Ms. Phillips increased her dosage of Lamictal and prescribed a low dose of Seroquel to address trouble with sleep (AR. 471).

Williams saw Ms. Phillips on April 27, 2006 (AR. 470).  Ms. Phillips described Williams as slightly hypomanic but relatively stable, well groomed, and dressed appropriately (AR. 470).  Williams reported she had not increased her Lamictal dosage as discussed in the previous appointment, but also reported being satisfied with her current level of functioning (AR. 470).  She reported her continued involvement with the church at Salvation Army and that her occasional use of Seroquel helped with her anxiety during the day (AR. 470).

In the June 29, 2006, progress note Ms. Phillips noted Williams reported relative stability in her mood (AR. 469).  Ms. Phillips noted Williams "[b]orders on moderately hypomanic which is her normal presentation" (AR. 469).  Williams arrived for her appointment dressed appropriately with manicured nails (AR. 469).  Ms. Phillips continued the Lamictal and Seroquel as previously ordered (AR. 469).

Williams next saw Ms. Phillips on October 12, 2006 (AR. 468).  Williams reported doing well and satisfaction with her mood stability (AR. 468).  In addition to working part-time cleaning and caring for an elderly woman, she reported a new part-time job at a convenience store (AR. 468).  However, she reported feeling stressed after three days at the convenience store job (AR. 468).  Ms. Phillips noted Williams presented slightly hypomanic and appropriately attired (AR. 468).  Ms. Phillips continued Williams on her current medications with a follow-up appointment in three to four months (AR. 468).

In the March 14, 2007, progress note Ms. Phillips noted Williams called the office in January 2007 complaining of depression and Ms. Phillips added Wellbutrin to Williams' prescribed medications (AR. 467).  At the March 14, 2007, appointment Williams complained of several physical problems, but reported her depression had improved and her mood was relatively stable (AR. 467).  She reported working part-time at a diner as well as at Goodwill Industries (AR. 467).  Ms. Phillips continued Williams' prescribed medications (AR. 467).

10

In the progress note from Williams' May 24, 2007, appointment Ms. Phillips noted Williams presented as slightly hypomanic but with no mania (AR. 466). Ms. Phillips noted Williams was wearing makeup and had manicured nails (AR. 466). Williams reported her mood had been relatively stable but working six 8-hour days at her new job was stressful for her, both physically and mentally (AR. 466). Ms. Phillips provided Williams with a note for her employer "limiting her work to no more than five hours daily three days per week and no more than two days consecutively" (AR. 466). Ms. Phillips also noted Williams was not taking her Wellbutrin as prescribed (AR. 466).

Williams saw Ms. Phillips again on August 14, 2007 (AR. 465). Williams reported working two part-time jobs, a total of 17 to 20 hours per week, and having married her longtime boyfriend in July (AR. 465). Williams described herself as stable with good and bad days (AR. 465). Ms. Phillips noted Williams' appearance was neat and clean, and that she appeared emotionally fragile at times during the appointment (AR. 465). Ms. Phillips further noted "lots of psychosocial change" in Williams' life and continued her on Lamictal and Wellbutrin as prescribed (AR. 465).

In October 2007 Ms. Phillips completed a Medical Source Statement - Mental (AR. 480-482). Ms. Phillips opined that Williams is "[n]ot expected to be gainfully employed due to mental impairments" (AR. 480). Ms. Phillips also rated Williams' abilities as markedly limited in several areas including sustained concentration, persistence and adaptation. (AR. 480-481). Ms. Phillips noted either no or moderate limitations in areas involving social interaction, understanding and memory (AR. 430-481).

On June 19, 2008, Williams saw Dixie Heuton, Ph. D. (Dr. Heuton), for a consultative evaluation at the direction of the ALJ (AR. 522-531, 653). The evaluation appears to have consisted solely of an interview with Williams. There is no indication that the evaluation involved any psychological testing, review of records, or consultation with collateral sources. Rather, Dr. Heuton's opinions appear to be based solely on Williams' self-report. Dr. Heuton noted that Williams' affect was depressed at the time of the evaluation. (AR. 526). Williams reported that "mentally she has not been good for at least a year" (AR. 525). "She reports that she does not even take care of her hair or teeth or anything like she should when she is depressed" (AR. 526). However, Dr. Heuton noted

11

Williams was well-groomed, with a cooperative and friendly demeanor on the date of the evaluation, even though she exhibited symptoms of depression at the time (AR. 522). Williams reported taking Lamictal for bipolar disorder and Wellbutrin for depression (AR. 523) and participating in therapy with Mr. Daiss (AR. 526). At the time of the evaluation, Williams was working early morning hours at a convenience store (AR. 523). Williams described having held several jobs including one which she left because her wages were going to be garnished (AR. 524). Dr. Heuton opined Williams' reported symptoms were consistent with a diagnosis of bipolar disorder, with more problems with depression than manic episodes recently, and assigned a GAF of 40[8] (AR. 526, 528). Dr. Heuton diagnosed Williams with "Bipolar I Disorder, most recent episode depressed, mild" and opined Williams suffered from problems with finances, occupation, physical issues and her primary support system, noting her recent divorce (AR. 528). Dr. Heuton indicated Williams' daily living activities are restricted, especially when she is depressed, and Williams suffers a physical reaction to stress which may lead to a depressive episode (AR. 527).

On the date of the evaluation, June 19, 2008, Dr. Heuton completed a Medical Source Statement on behalf of Williams, evaluating her ability to do work-related activities on a sustained basis (AR. 529-531). Dr. Heuton indicated Williams had mild restrictions in her ability to understand, remember, and carry out simple instructions; and the ability to make judgments on simple and complex work-related decisions (AR. 529). Dr. Heuton noted moderate restrictions on Williams' ability to understand, remember, and carry out complex instructions (AR. 529). In support of her assessment, Dr. Heuton wrote that Williams appeared to have "some memory issues"[9] (AR. 529). Dr. Heuton further indicated Williams' ability to interact appropriately with supervisors, co-workers, and the public, or to respond to changes in the routine work setting was not affected by her impairments (AR. 530).

---

[8]**See** supra note 7.

[9]Dr. Heuton recommended full memory testing to address Williams' reported memory problems (AR. 527-528).

**B.    Williams' Testimony**

On March 5, 2008, Williams testified at the administrative hearing before the ALJ (AR. 605-629).  She stated she was currently employed part-time as kitchen help at a convenience store, working 15 hours per week (AR. 606-607).  She testified she had worked at several part-time jobs since her onset date, October 13, 2003, but had not held a full-time job during that time period (AR. 606-07).  Williams testified she left the numerous part-time jobs after less than three months because of her disabilities (AR. 608). She stated she could not have worked full-time at these jobs because she would have found it too overwhelming (AR. 609).

Williams testified that when she worked as a cashier, she was able to do the job satisfactorily when faced with intermittent customers (AR. 611).  However, when confronted with a line of waiting customers Williams felt dizzy and confused, causing her to make major mistakes (AR. 611).  She further described problems with her memory and with crying spells (AR. 612).  Williams stated she would be unable to handle the stress of a full time job, physically or emotionally, and that Ms. Phillips had suggested Williams not work more than four or five hours, three days per week, not more than two days in a row (AR. 611-612, 616).

Williams testified concerning the mood swings she experiences with her bipolar disorder.  She described experiencing euphoria approximately once every two months with a duration of less than one week (AR. 617).  During euphoric episodes, Williams has gone on shopping sprees resulting in financial problems (AR. 626).  She described experiencing depression, when she doesn't care if she eats or gets out of bed, three times per month with episodes lasting approximately one week (AR. 617).

Williams testified she has participated in bi-weekly therapy with Mr. Daiss for three to four years (AR. 626).  Her longest break in therapy was for a month (AR. 626).  Williams also testified she saw Ms. Lippa for therapy, and Dr. Stous for medication management during a brief move to Kansas City, Missouri (AR. 628-629).  Williams admitted she had never been hospitalized for psychiatric care even though her therapist, Mr. Daiss, recommended hospitalization (AR. 617).  She stated she chose not to be hospitalized because she "didn't want people to know" and "it's just a pride thing" (AR. 618).

13

C.     **Vocational Expert's Testimony**

The vocational expert (VE), Gail Leonhardt, appeared and testified he had reviewed the documentary evidence and heard the testimony of the medical expert and Williams. (AR. 640).  The ALJ asked the VE to consider a hypothetical claimant with Williams' vocational profile who has the "overarching residual functional capacity to perform a full range of light work" (AR. 642).  The ALJ went on to describe the hypothetical claimant as having the following limitations: marked limitations in interacting appropriately with the public; moderate to marked limitations in making judgments on complex work-related decisions and in understanding, remembering, and carrying out complex instructions; moderate limitations in dealing with unusual work situations, responding appropriately to a change in work routine, and interacting appropriately with coworkers and supervisors when that contact was brief, superficial, and job-related; no limitation to mild limitation in carrying out short, simple instructions; and no limitation in understanding and remembering short, simple instructions (AR. 642-643).  The hypothetical claimant was further described by the ALJ with the following restrictions:  no extremes of cold, heat or humidity; no moving machinery; no use of motor, air or vibrating tools or motor vehicles; no pushing or pulling levers repetitively;[10] no repetitive motions with her upper extremities bilaterally; difficulty with fine dexterity; crawling and kneeling limited to occasional; climbing, bending, twisting and turning limited to frequent.

The VE testified the claimant would not be able to perform any of her past work, including dental assistant or secretary (AR. 647).  The VE testified that at the unskilled, light exertional level, the claimant could work in the following positions:  a production assembler with 5,930 jobs existing in the four-state region of Iowa, Nebraska, Missouri and Kansas, and 107,431 jobs in the national economy; a packager with 10,649 jobs existing in the four-state region, and 220,066 jobs in the national economy; and unskilled office helper with 7,769 jobs existing in the four-state region, and 176,307 jobs in the national economy (AR. 648-651).  The ALJ then asked the VE to consider the first hypothetical with

---

[10]The ALJ defined repetitive motion as "making the same motion . . . 10 times or more . . . in 10 seconds or less.  Anthing less than that or anything slower than that would not constitute a repetitive motion" (AR. 647).

the residual functional capacity reduced from light to sedentary (AR. 651).  The VE testified the reduction in exertional level would limit production assembler jobs to 184 and packager jobs to 651 in the four-state region (AR. 651-652).  The VE further testified office helper jobs would be reduced to 2,825 in the four-state area and 64,112 in the national economy (AR. 652).

Williams' attorney posed two additional hypotheticals to the VE.  First, assuming the hypothetical claimant was absent from work at least four days each month; and second, assuming marked limitations in "the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" (AR. 652).  In response to each hypothetical, the VE testified the individual would not be able to perform past relevant work or any other work (AR. 652).

## THE ALJ'S DECISION

The ALJ concluded Williams was not disabled under the Act from October 13, 2003, through the date of the decision and therefore not entitled to disability insurance benefits (AR. 23, 48).  The ALJ framed the issues as:  1) whether Williams was disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act; and 2) whether Williams met the insured status requirements of sections 216(i) and 223 of the Act (AR. 23).  With respect to the second issue, the ALJ found Williams remained insured through December 31, 2010, and must establish disability on or before that date to be entitled to a period of disability and disability insurance benefits (AR. 23).  As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to any medically determinable physical or mental impairment or combination of impairments (AR. 23).  **See** 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  These impairments must be expected to result in death or must last for a continuous period of at least 12 months.  *Id.*

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations.  ***Flynn v. Astrue**, 513 F.3d 788, 792 (8th Cir. 2008)*; 20 C.F.R. § 404.1520(a)(4).

15

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quotation omitted).  More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  **See** 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984).  If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  **See** *Braswell*, 733 F.2d at 533.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.  **See** *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  A claimant's residual functional capacity is a medical question.  **See** *id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted)).

In this case, the ALJ followed the appropriate sequential analysis.  The ALJ reviewed the record and determined Williams had not engaged in any type of substantial and gainful work activity since October 13, 2003, the alleged date of disability (AR. 25).  Next, the ALJ found Williams had impairments considered severe under the Social Security regulations including:  fibromyalgia; bipolar disorder; depression; head tremors; and mild thrombocytopenia (AR. 25).

16

At step three, the ALJ found that Williams' medically determined impairments, either singly or collectively, do not equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (AR. 27). Specifically relevant to Williams' appeal, the ALJ determined Williams' mental impairments, either singly or collectively, do not equal the criteria of listing 12.04 (AR. 28). The ALJ observed Williams' mental impairments caused mild to moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (AR. 28-29). Because Williams did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ found the "paragraph B" criteria were not met (AR. 29). Similarly, the ALJ found the evidence did not establish the presence of "paragraph C" criteria, as there was no evidence Williams had experienced repeated periods of decompensation or was "unable to function outside a highly supportive living arrangement" (AR. 29).

The ALJ proceeded to determine Williams' residual functional capacity (RFC) (AR. 29-31). The ALJ explicitly stated he considered all of Williams' symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings (SSR) 96-4p and 96-7p (AR. 31). The regulations and SSRs cited by the ALJ list factors to consider when determining the claimant's credibility. The ALJ found Williams' allegations "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible" (AR. 38). Specifically, the ALJ noted Williams had never been hospitalized due to her psychological problems[11] (AR. 38). The ALJ noted Williams' admission that she ignored her therapist's recommendation of hospitalization because of her pride and her desire to keep others from knowing, in addition to evidence that she independently stopped taking her medication in 2005, raises questions about the severity of her conditions and their impact on her ability to work (AR.

---

[11]At the March 5, 2008, hearing the ALJ questioned Williams about being hospitalized in June 2005 (AR. 628-629). Williams testified she did not remember being hospitalized (AR. 628-629). The record indicates, and the ALJ explains in his decision, that Williams' mother, not Williams, was hospitalized for a nervous breakdown in 2005 (AR. 38, 387-388).

38).  Moreover, the ALJ discussed discrepancies between Williams' reported daily activities "over the course of time" and her complaints of disabling symptoms (AR. 39).  For example, the ALJ mentions that Williams reported assisting an elderly woman with chores and appointments, as well as doing housework, taking walks, shopping, cooking, applying for jobs, and maintaining her immaculate appearance (AR. 39).

In addition to the findings about Williams' credibility, the ALJ considered the opinions of the professionals who evaluated and treated Williams during the pertinent time period.  The ALJ concluded Dr. Fix's opinion was consistent with the overall record and entitled to great weight (AR. 41).  In contrast, the ALJ accorded no weight to Dr. Heuton's evaluation as her report lacked "any critical analysis or empirical or other supporting study or documentation" and was "merely a summary of the claimant's statements" (AR. 46).  The ALJ considered the opinions of Ms. Phillips, Mr. Daiss, and Ms. Lippa as "other sources" pursuant to the guidelines of SSR 06-3p (AR. 41-43).  The ALJ accorded little weight to Ms. Phillips' 2004 and 2007 opinions, finding them inconsistent with the medical evidence including her own treatment progress notes (AR. 41, 43).  The ALJ gave the 2004 opinion authored by Mr. Daiss less weight relative to other medical sources as it did "not reflect comments made during the course of Mr. Daiss' interaction with [Williams]" (AR. 42).  Similarly, the ALJ accorded little weight to Ms. Lippa's opinion as it was inconsistent with her treatment progress notes (AR. 43).

Based on the ALJ's consideration of the record, the ALJ found Williams has an RFC for a sedentary level of work, as follows.

> can lift and carry 10 pounds occasionally and less than 10 pounds frequently; can stand 2 hours and sit for 6 hours in an 8-hour workday; occasionally crawl or kneel; frequently stoop, squat, climb, bend, twist, and turn; cannot be subjected to extreme cold, heat, humidity, or concentrated dust, smoke, or fumes; could not work at unprotected heights or with moving machinery, motor vehicles, or motor, air, or vibrating tools; unlimited in ability to understand and remember short, simple instructions; unlimited to mildly limited in ability to carry out short, simple instructions; moderately to markedly limited in ability to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions; markedly limited in ability to interact appropriately

18

    with the public; moderately limited in the ability to respond to changes in routine and interact appropriately with coworkers and supervisors.

(AR. 29-31).

   At step four, the ALJ found Williams incapable of performing any past relevant work (AR. 46). At the last step, the ALJ concluded Williams could perform other work existing in significant numbers in the national economy (AR. 47). Therefore, the ALJ found Williams is not disabled and has not been under a disability from October 13, 2003, the alleged onset date of disability, through the date of the ALJ's decision (AR. 47).

## STANDARD OF REVIEW

   A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard"). "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (alteration added). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law de novo. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as

they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (alteration added)).

## DISCUSSION

### A.   Weight of Evidence

Williams contends the ALJ improperly weighed the evidence in the record, giving preference to the opinion of consultative examiner, Dr. Fix, and largely dismissing the opinions of the advanced practice registered nurse, Ms. Phillips.  **See** Filing No. 21 - Brief p. 10.  Williams argues the ALJ should have accorded more weight to Ms. Phillips' 2007 opinion because it was based on a longitudinal view of Williams' mental health and treatment from 2004 to 2007, whereas Dr. Fix's opinion is based on a one-time evaluation in 2004.  *Id.*

The SSA recognizes two types of sources for evidence that may be used as evidence of an impairment or the severity of an impairment:  "acceptable medical sources" and "other sources."  **See** 20 C.F.R. § 404.1513.  Therapists and nurse-practitioners are listed under "other sources" and are not considered "acceptable medical sources."  20 C.F.R. § 404.1513(d)(1); **see also** *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005).  An "other source" opinion may by used to show the severity of an impairment and how it affects the individual's ability to function, but may not be used to establish an impairment.  **See** 20 C.F.R. § 404.1513; SSR 06-3p.  An acceptable medical source that is also a treating source may be entitled to controlling weight.  **See** SSR 06-3p.  However, "[i]n determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney*, 396 F.3d at 1010 (**citing** 20 C.F.R. § 416.927(d)(4)).

As an APRN, Ms. Phillips does not quality as an acceptable medical source, nor does her opinion constitute a medical opinion under the regulations.  **See** 20 C.F.R. § 416.927(a)(2) (defining medical opinions as "statements from physicians and psychologists or other acceptable medical sources").  Nevertheless, in an effort to convince the court that the ALJ erred by discounting the opinions of Ms. Phillips, Williams cites the Eighth Circuit Court of Appeals' decision *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003).  **See** Filing

No. 21 - Brief p. 9-10. The court in *Shontos* held sources usually considered by ALJs to be "other" medical sources may be considered "treating" sources when they are part of a treatment team that includes an acceptable medical source in accordance with the regulations. *Shontos*, 328 F.3d at 426. In *Shontos*, the treatment team consisted of a treating clinical psychologist; a nationally certified, master's degree counselor who was also a registered nurse; and a nurse practitioner. *Id.* at 421. The opinions of these three treating mental health care providers were consistent. The court held the claimant's team of mental health care providers, including her counselor and nurse practitioner, could be afforded "treating" source status for the purposes of weighing medical and opinion evidence because they were part of a "treatment team" which included an acceptable medical source in accordance with the regulations. *Id.* at 426.

Williams' reliance on *Shontos* is misplaced. The *Shontos* court holding is not applicable to the case at hand. Ms. Phillips was not a treating source as defined by the regulations, nor was she a member of a treatment team that included a physician, psychologist or other acceptable medical source who could potentially give her treating source status. While Ms. Phillips' outpatient progress notes were copied to Dr. Seizys, there is no indication in the record that Dr. Seizys provided Williams with any psychiatric treatment or evaluation after March 2004, or that Ms. Phillips consulted with Dr. Seizys regarding Williams' treatment (**see, e.g.**, AR. 465-474). The record does reflect that Dr. Seizys turned Williams' psychiatric medication management over to Ms. Phillips in March 2004, after admitting it was outside of her area of specialty (AR. 282).

The ALJ correctly considered Ms. Phillips an "other source" rather than as a treating source or an acceptable medical source. As such, the ALJ is required to consider her opinion when evaluating the severity of Williams' impairments and the effect her impairments have on her ability to work. **See** 20 C.F.R. § 404.1513; SSR 06-3p. While the ALJ is required to consider Ms. Phillips' opinion, he is not required to accept it or assign it great weight. The ALJ has the discretion to reject or discredit her opinion if it is inconsistent with other evidence in the record. *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006).

Williams saw Ms. Phillips regularly for medication management throughout the period of her alleged disability; the record includes progress notes from at least sixteen such appointments between 2004 and 2007 (**see, e.g.**, AR. 465-474).  Nevertheless, the ALJ gave little weight to her opinions (AR. 41, 43).  The ALJ explained his decision by pointing out inconsistencies between Ms. Phillips' opinions, indicating marked limitations in several areas of functioning, and her own treatment progress notes from the same periods of time, which indicate Williams' relative mood stability and improved concentration and focus (AR. 41-43).  The ALJ also noted Ms. Phillips' 2007 opinion was inconsistent with Mr. Daiss' treatment notes from the same time period, indicating Williams was experiencing an decrease in her symptoms accompanied by "increasing opportunities in her life" (AR. 43).

On the other hand, the ALJ found Dr. Fix's opinion consistent with the overall record (AR. 41).  Additionally, the court's review of the record shows Dr. Fix's opinion that Williams' bipolar disorder was adequately under control with medication and therapy is consistent with treatment notes from Ms. Phillips and Mr. Daiss.  For example, Ms. Phillips indicates Williams presents as slightly hypomanic, her normal presentation, and reports doing well with stable moods (AR. 318, 320, 466, 468-474).  The court finds the ALJ's determination of the relative weight to accord to the opinions of Dr. Fix and Ms. Phillips is supported by substantial evidence on the record as a whole.

## B.    Outdated Evidence

Williams suggests the ALJ's RFC finding was not based on substantial evidence because the ALJ relied on the opinions of state agency consultants and a consultative examiner, Dr. Fix, all issued in 2004.  **See** Filing No. 21 - Brief p.16-17.  Williams argues that by relying on out-of-date evidence, the ALJ's decision was not supported by substantial evidence on the record as a whole.  **Id.** at 17.  As an initial matter, Williams is incorrect in her assertion that the ALJ relied on the opinions of the state agency non-examining medical consultants in determining Williams' RFC.[12]

---

[12]Those findings are found at AR. 218-238, 256-273.

22

> In this case, the residual functional capacity determined by the undersigned differs from the State agency non-examining medical consultants, because all medical evidence in the record and the testimony presented at the hearing was not available to the State Agency medical consultants at the time they issued their opinions. Therefore, the residual functional capacity established by agency physicians is considered less in concert with the claimant's actual residual functional capacity as reached by the undersigned.

(AR. 45).

The court agrees with Williams that the records from her treatment with Ms. Phillips, Mr. Daiss, and Ms. Lippa were not available for review when the non-examining medical consultants and Dr. Fix made their findings in 2004. However, Williams incorrectly contends the ALJ did not consider evidence produced after 2004 when determining Williliams' RFC. The ALJ has a duty to fully and fairly develop a record; however, the ALJ does not have to discuss every piece of evidence presented. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). "Moreover, [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (alteration in original) (**quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)**). Contrary to Williams' arguments, the ALJ clearly considered evidence from later than 2004, including the treatment progress notes of Ms. Phillips and Mr. Daiss as well as the therapy progress notes of Ms. Lippa from 2005. The ALJ specifically discussed Phillips' March 14, 2007, progress note describing Williams' condition as relatively stable on current medications; then in more general terms wrote "[e]nsuing treating notes from Ms. Daiss and Ms. Phillips reveal waxing and waning symptoms, such as tearfulness, over the course of the next several months" (AR. 43). The ALJ also discusses Ms. Lippa's progress notes from 2005, in which she consistently assigns Williams GAF scores ranging from 58 to 60, scores which are characterized by moderate symptoms and moderate difficulties in functioning (AR. 43).

"Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (**citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)**). The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication as long as the impairment is generally controllable. *Davidson*, 578 F.3d at 846. The court's review of the record shows the highs and the lows associated with bipolar disorder. However, the court notes Williams

disrupted her mental health treatment with Ms. Phillips and Mr. Daiss, and community support services in 2004, and again in 2005, by moving out of state (AR. 193, 318, 475). Upon her return in 2005, she complained to Ms. Phillips of depression and mood lability and admitted she had not taken her medications for the previous two months (AR. 475). Four months later, on December 27, 2005, Williams told Mr. Daiss she wanted to reduce her therapy sessions from bi-weekly to monthly to accommodate her various activities (AR. 190). On another occasion in 2007, Williams complained of feeling stressed at her new job but also admitted not taking her Wellbutrin as prescribed (AR. 465). In any event, Williams' hearing testimony with respect to the frequency and duration of her depressive episodes is contradicted by the treatment notes of Ms. Phillips and Mr. Daiss. Those notes frequently document Williams' appropriate or slightly hypomanic affect, impeccable grooming, and positive outlook. Moreover, the less frequent notes documenting Williams' depressive affect and lability tend to coincide with her reports of relationship and/or financial problems, and frustration associated with her claim for disability (**see, e.g.**, AR. 192, 466-467).

The ALJ fully and properly evaluated the evidence in the record when determining Williams' RFC. While Williams may be able to point to evidence that could support a finding of disability, this court "may not reverse [the ALJ's decision] because substantial evidence exists in the record that would have supported a contrary outcome." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). That is, Williams' RFC, as determined by the ALJ, is the product of the ALJ's responsibility to weigh and reconcile potentially conflicting evidence in the record and the dutiful fulfillment of that role is not to be overturned or superseded by the court. 20 C.F.R. § 416.927(c)(2); *McNamara*, 590 F.3d at 610. As discussed in detail above, sufficient evidence supports the ALJ's findings. Therefore, the court finds that, having properly considered the evidence in the record, the ALJ appropriately determined Williams' RFC.

**CONCLUSION**

For the reasons discussed, the Court concludes that the Commissioner's decision denying benefits is supported by substantial evidence on the record as a whole and is affirmed.

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and a separate Judgment in favor of the defendant will be entered.

DATED this 28th day of March, 2011.

BY THE COURT:

 /s Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.